UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-00973-JRS-MPB |
| ) | |
| THE TRUSTEES OF INDIANA ) | |
| UNIVERSITY, and INDIANA ) | |
| UNIVERSITY PURDUE , ) | |
| UNIVERSITY - INDIANAPOLIS ) | |
| ) | |
| Defendants. ) | |

### BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
### FOR TEMPORARY RESTRAINING ORDER

Plaintiff, John Doe ("Plaintiff"), by counsel, Jonathan A. Bont and Ian P. Goodman, for his Brief in Support of his Motion for Temporary Restraining Order ("TRO") against Defendants The Trustees of Indiana University and Indiana University Purdue University – Indianapolis ("IUPUI"), states as follows:

### INTRODCUTION

On Monday April 19, 2021, Defendants suspended Plaintiff, an international student with a 3.88 GPA, from IUPUI, when he was less than a month away from graduation and had only a few assignments and exams left to complete. The suspension followed Jane Roe's accusation that Plaintiff raped her. But her accusation was not substantiated: she gave conflicting reports; there was evidence that refuted her reports; and Plaintiff provided a consistent version of events. And yet, inexplicably, IUPUI found Jane Roe credible, and summarily characterized

Plaintiff as dishonest, and IUPUI ruled that Plaintiff had raped Jane Roe. The result was Plaintiff's suspension from IUPUI until 2023.

IUPUI's decision making process was arbitrarily biased against Plaintiff due to his gender. Moreover, IUPUI's policy in evaluating "consent" in the context of a sexual encounter is fundamentally flawed, as it has gender biased built in. As such, IUPUI violated Title IX, and the Court should not hesitate to immediately restrain IUPUI from enforcing its suspension of Plaintiff, which would prohibit him from graduating and likely result in the revocation of his student visa.

Plaintiff is prepared for a full evidentiary hearing on the merits of his request for preliminary relief. The Court could convert this motion into one seeking a preliminary injunction, but time is of the essence. As stated in footnote 1 below, Plaintiff has imminently approaching presentations and exams. To the extent IUPUI is seriously concerned for the safety of its student body and, in particular, Jane Roe (who has continually been on the same campus as Plaintiff since the September 11, 2020 incident in question) its concern would be mitigated because Plaintiff can complete all his remaining coursework remotely.

## FACTS

Plaintiff is a 22 year-old black male. He is citizen of Nigeria and is permissibly in the United States on a student visa. During the period relevant to this matter, Plaintiff was enrolled as an undergraduate student in his senior year of studies, at IUPUI, where he was pursuing a degree in mechanical engineering. Plaintiff is an exemplary student. He had earned a 3.88 grade point average and, prior to the

wrongful suspension that is the subject of his Complaint and motion for TRO, was on the cusp of completing his undergraduate coursework[1] and graduating, on May 15, 2021, with honors. (Exhibit A, ¶¶ 1-5.) Moreover, Plaintiff had been accepted into an IUPUI mechanical engineering graduate program, which he had been set to begin in fall 2021.

IUPUI has just informed Plaintiff that the continued validity of his student visa depends on his continued engagement in educational pursuits, namely with IUPUI. As such, it appears IUPUI is commencing proceedings to revoke Plaintiff's student visa. (Exhibit 1 to Exhibit A.)

### A. Plaintiff and Jane Roe's Interactions

Defendants' suspension of Plaintiff arose from IUPUI's investigation of a sexual encounter between him and Jane Roe. On or about September 12, 2020, Jane reported to the Indiana University Police Department ("IUPD") that, on September 11, 2020, Plaintiff burglarized her apartment and confined her therein and raped her. (Exhibit B, IUPUI Report of Allegations.) On September 14, 2020, IUPD notified

---

[1] At the time he was suspended, Plaintiff had remaining the following coursework in order to complete his undergraduate studies:
- ME 569 (Mechanical Behavior of Materials): second mid-term exam April 19, 2021; final exam May 3, 2021;
- ME 551 (Finite Element Analysis): group presentation on May 3, 2021;
- ME 406 (Robust Design): presentation on April 28, 2021; final paper due May 5, 2021;
- ME 46200 (Capstone Design): work with group on project and present on May 6, 2021; and
- ME 48200 (Control System Analysis & Design): assignment due May 2, 2021; final exam May 4, 2021.

(Exhibit A, ¶ 5.)

IUPUI of Jane's allegations. (Exhibit C, IUPUI Final Investigation Report, p. 1.) IUPUI proceeded to investigate Jane's allegations, with its inquiry focused on whether Plaintiff had violated the Indiana University Discrimination, Harassment, and Sexual Misconduct Policy UA-03 (the "Policy") and the IUPUI Code of Student Rights, Responsibilities and Conduct (the "Code"). (Exhibit C, p. 1; see Exhibit D, the Policy, Exhibit E, the Code.)

Plaintiff and Jane were acquainted long prior to the encounter that led to her allegations against him. They had met in 2019 in a class at IUPUI. Jane soon told Plaintiff she had feelings for him, and she multiple times asked Plaintiff to spend time with her. They spent time together three times during October 2019. The first time, Jane initiated kissing Plaintiff. The second time, Plaintiff accepted Jane's invitation for him to watch her in a dance practice. The third time, Jane repeatedly expressed to Plaintiff her desire that they find privacy. Once they did, in Plaintiff's vehicle, they engaged in a consensual sexual encounter, where Jane ultimately told Plaintiff she wanted to have sex with him, though Plaintiff declined because he did not have a condom. (Exhibit A, ¶ 6.)

Following their consensual sexual encounter, after Plaintiff drove Jane home, Jane sent him text messages stating that the two of them should not be in a relationship because she was not ready to date. At the time, Plaintiff and Jane had spent minimal time together, and had never discussed a relationship. Thus, Plaintiff was confused by Jane Roe's text messages. In any case, Plaintiff responded that he understood and respected her position. (Exhibit A, ¶ 6.)

Plaintiff and Jane Roe did not communicate again until March 2020, when Jane commented on an Instagram post that Plaintiff made. After that, they exchanged a small number of messages on Instagram. They engaged in similar, infrequent communications on Instagram during June, July and August 2020. (Exhibit A, ¶ 7.)

On September 11, 2020, Jane, in text messages to Plaintiff, invited him to her apartment. Plaintiff agreed and arrived at approximately 6 p.m., and the two of them engaged in a consensual sexual encounter. As the sexual encounter progressed, Jane asked Plaintiff if he had a condom; Plaintiff said he did, but it was too old to use. Jane stated she had a condom, which she retrieved and gave to Plaintiff. Jane stated that she had not had sex before but wanted to at that time. Plaintiff and Jane began having sex. Jane multiple times expressed to Plaintiff that she was experiencing discomfort and asked him to stop penetrating her; each time Plaintiff promptly complied. But on each occasion, the two spoke and Jane voluntarily reengaged in sex with Plaintiff. Eventually, Plaintiff became uncomfortable with Jane telling him to stop and then reinitiating the encounter, and he stated they should not continue to have sex. (Exhibit A, ¶ 8.)

Jane began to cry. She asked Plaintiff, "What are we now?" Plaintiff responded, stating that he was not under the impression that they were in a relationship. Jane instructed him to leave. Plaintiff complied. When he arrived home, he texted and called Jane, but she did not answer. Plaintiff and Jane have not communicated since. (Exhibit A, ¶ 9.)

### B. IUPUI's Administrative Process

On or about February 18, 2021, IUPUI tendered to Plaintiff a Final Investigation Report, which detailed IUPUI's investigation of whether Plaintiff had violated the Code and the Policy (the "Report"). The Report indicated there were few undisputed material facts, while most operative, materials facts were disputed. Nevertheless, the Report provided that charges against Plaintiff, under both the Code and the Policy, concerning alleged sexual harassment and abuse, were warranted. (Exhibit C, pp. 19-22.)

When IUPUI was investigating Jane's allegations against Plaintiff, Plaintiff asked Kailey Rigdon, who was investigating the matter on behalf of IUPUI, what witnesses at the hearing would be presented against him and what witnesses he could bring. Ms. Rigdon responded that only witnesses who had first-hand accounts of the incident could be called at the hearing. Because only Jane and Plaintiff had been present during the incident, following Ms. Rigdon's instruction, Plaintiff called no witnesses at the hearing. But, as it turned out, the Hearing Panel did not hold Jane to Ms. Rigdon's instruction. For example, Jane's mother, who had no first-hand knowledge of the incident, was permitted to testify. Had Plaintiff known such witnesses were permitted, I would have brought some of his own, potentially including an IUPUI professor who had observed Jane and Plaintiff in a classroom setting together. (Exhibit A, ¶ 10.)

On March 5, 2021, IUPUI's University Hearing Panel conducted a hearing regarding the charges against Plaintiff for alleged violations of the Code and the

6

Policy. The Hearing Panel ruled that Plaintiff had violated the Code and the Policy by committing sexual assault, rape and forcible sodomy or sexual assault or forcible fondling. As a result, IUPUI suspended Plaintiff until May 21, 2023. (*See generally* Exhibit F.)

On April 3, 2021, Plaintiff tendered to IUPUI his appeal of the Hearing Panel's ruling against him. In his appeal, Plaintiff took issue with the Hearing Panel's weighing of the evidence, namely its finding that Jane had been credible, despite several evidentiary reasons that clearly indicated she was not. Moreover, Plaintiff took issue with the Hearing Panel's finding that he had been uncredible, despite little to no basis for this finding. For example, Plaintiff stated that the Hearing Panel had identified as a "foundation" for their adverse ruling that Jane had provided consistent accounts of the incident to witnesses. (Exhibit G, pp. 2-8.) Plaintiff identified that this was obviously false, considering:

- in a phone call to a friend after the incident, Jane stated she and Plaintiff had gone to a party and gotten drunk and then, back at her apartment, Plaintiff had raped her; but, at the hearing, Jane stated she did not convey such information to her friend and she did not know where her friend would have acquired such information; and, the friend, at the hearing, stated she specifically remembered Jane providing her such information;
- Jane told another friend that Plaintiff had come to her apartment and she thought he had raped her; and
- Jane told a third friend that Plaintiff came to her apartment and, while they sat on the couch, Plaintiff had suddenly picked her up and taken her to the bedroom and raped her.

(Exhibit G, pp. 2-3.)

In his appeal, Plaintiff identified that the Hearing Panel, rather than finding that Jane's conflicting statements of the incident diminished her credibility, found

7

that the witnesses' accounts strengthened her credibility. Plaintiff went on to identify additional reasons why the Hearing Panel could not have reasonably found Jane credible. Jane testified that she had not consented to Plaintiff kissing her breasts and touching her genitals. The Hearing Panel, however, determined that there had been insufficient evidence to find that these sexual acts had not been consensual – thereby impliedly calling into question Jane's credibility. Moreover, the Hearing Panel apparently ignored that, although Jane had claimed Plaintiff had strangled her neck during sex, a close-in-time medical examination of Jane revealed no trauma to her neck. Further, the Hearing Panel disregarded that Jane had apparently reported to IUPD that Plaintiff had burglarized her apartment and then, at the hearing, had acknowledged he had been a welcomed guest. Despite all this, Plaintiff identified, the Hearing Panel expressly stated it had been assured of Jane's credibility. (Exhibit G, pp. 2-8.)

In his appeal, Plaintiff identified additional irregularities in the Hearing Panel's decision-making process. In characterizing Plaintiff's testimony, the Hearing Panel, in its Outcome Letter, had written, "The Respondent admitted that the Complainant asked him to stop penetrating her." (Exhibit F, p. 3.) This fact, which was seemingly crucial to the Hearing Panel's ruling, was a significant mischaracterization of Plaintiff's actual testimony. In actuality, Plaintiff had testified that Jane had several times asked Plaintiff to stop because she was hurting and, after Plaintiff complied, she verbally expressed her desire to continue to engage in sex – until Plaintiff declined to continue. (Exhibit G, p. 4.)

8

In sum, Plaintiff devoted a substantial portion of his appeal to identifying how the case presented to the Hearing Panel had been one of "he-said-she-said." And, Plaintiff identified, while there were several reasons to question Jane's credibility, if not to find her outright uncredible, the Hearing Panel merely concluded that Jane had been truthful and Plaintiff dishonest. (*See generally* Exhibit G.)

Moreover, Plaintiff identified how the Hearing Panel omitted key facts from its Outcome Letter, and presumably, therefore, from its decision making process. The Hearing Panel inexplicably disregarded that they had learned at the hearing, for the first time, that Plaintiff and Jane had had a consensual sexual encounter in October 2019. In other words, Jane had not disclosed this fact at any previous time during the investigation. The Hearing Panel similarly disregarded the fact that Jane had not herself disclosed this consensual sexual encounter to investigators or the Hearing Panel. Rather, the encounter was elicited on Plaintiff's cross examination of Jane. (Exhibit G, pp. 6-7.) This consensual sexual encounter and Jane's apparent attempt to shield it from discovery were indisputably relevant to both whether the sexual encounter at issue had been consensual and to Jane's credibility – but the Hearing Panel discarded them.

Plaintiff also argued in his appeal that Jose Magallon Macie, who had been Chair of the Hearing Panel, had had a conflict of interest that should have precluded his participation. According to the published description of Mr. Macie's job at IUPUI, he was a primary investigator and hearing officer of allegations of personal misconduct. Thus, Mr. Macie's involvement in this matter was seemingly akin to a

9

detective and a judge. This scenario presented an obvious conflict of interest, but Mr. Macie proceeded in his role even so. (Exhibit G, pp. 8-10.)

Finally, Plaintiff pointed out in his appeal, the sanction imposed against him was disproportionate to the violations allegedly committed. Plaintiff identified that, in determining the sanction, the Hearing Panel had not considered the lack of aggravating factors and presence of mitigating factors. They did not consider that Plaintiff had no previous disciplinary or criminal history and that, even taking the allegations as true (which Plaintiff vehemently denies), he was a welcomed guest in Jane's apartment, not an intruder. Nevertheless, the Hearing Panel suspended Plaintiff from academic participation for two years, precluding him from graduating from IUPUI or any other institution of higher education and from working in the profession he had pursued. (Exhibit G, pp. 10-12.)

## LEGAL STANDARD

In his motion for TRO, Plaintiff requests that the Court immediately (albeit temporarily) restrain Defendants from enforcing the suspension of Plaintiff from IUPUI and seeking to revoke Plaintiff's student visa.

The Court has the power to issue a temporary restraining order ("TRO") in accordance with Rule 65. A TRO should be granted if the movant (1) has some likelihood of success on the merits, (2) has no adequate remedy at law, and (3) will suffer irreparable harm if the order is denied. *Baskin v. Bogan*, 12 F.Supp.3d 1137, 1140 (S.D. Ind. 2014). If these elements are met, the Court should consider the irreparable harm to the non-movant and balance it against the harm to the movant.

*Id.* The essence of a TRO "is its brevity, its *ex parte* character, and (related to the second element) its informality." *Geneva Assur. v. Medical Emergency Services*, 964 F.2d 599, 600 (7th Cir. 1992). A TRO can be put in place to stop irreparable harm just so long as is necessary to hold a hearing. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters, etc.*, 415 U.S. 423, 439 (1974).

## ARGUMENT

### A. Plaintiff is reasonably likely to succeed on the merits of his Title IX claim.

"Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d. Cir. 1993). In *Yusuf*, the court stated that "plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* Plaintiff, by the facts identified above, and by those affirmed by him in his Declaration, has met this standard – particularly at this stage where the requisite standard is to show "some likelihood" of success on the merits.

The facts set forth above show that gender was a motivating factor in the decision to discipline Plaintiff. Despite the fact that Jane Roe stated to a friend the night of the incident that alcohol played a factor (which she later denied), reported to campus police that Plaintiff had burglarized her (where text messages later revealed she invited Plaintiff to her apartment) and failed to disclose that she and Plaintiff had another consensual sexual encounter less than a year prior to the one in question, IUPUI decided her story that Plaintiff raped her was true. And, despite the fact that

11

Plaintiff's version of the story did not change throughout and accounted for the awkwardness and discomfort of his and Jane Roe's attempt at intercourse, IUPUI discredited his account entirely.

The Policy's flawed definition of "consent" may have guided IUPUI's biased, wrongful decision. The Policy defines "consent" as follows: "Consent cannot be assumed based on silence, the absence of 'no' or 'stop,' the existence of a prior or current relationship, or prior sexual activity." (Exhibit D, p. 35.) The Policy does not affirmatively state that such factors are absolutely relevant to whether consent exists, though they may be dispositive. Under Policy, the Hearing Panel would have necessarily shifted the burden to Plaintiff to *prove* consent – and then arbitrarily discarded all evidence he presented that Jane Roe had, in fact, consented to the sexual encounter. That is exactly the sort of injustice that Title IX prohibits.

Moreover, Plaintiff is likely to succeed on the merits of his Title IX claim because of the arbitrary and unfair manner in which the Hearing Panel conducted the hearing. IUPUI, by Ms. Rigdon, expressly told Plaintiff that no witnesses could testify at the hearing had not been present at the incident. Plaintiff, therefore, adhered to this instruction. But, with the Hearing Panel's acquiescence, Jane did not. This meant that Plaintiff was precluded from presenting witnesses, such as an IUPUI professor, who could have testified regarding the interactions of Plaintiff and Jane long before the incident. This was a clear instance of gender bias against Plaintiff.

Case law supports Plaintiff's likelihood of success on the merits. In *Doe v. University of Notre Dame,* 3:17-CV-298, 2017 WL 1836939, at *11-13 (N.D. Ind.

2017),[2] Notre Dame had dismissed Doe from the university only two weeks before he was set to graduate. *Id.* at *1. The granted Doe's request for a temporary restraining order against Notre Dame's dismissal of him. *Id.* In its ruling, the Court emphasized that Doe sought "narrow" relief: he sought only to take his two final exams, which, the Court stated made "time [of] the essence." *Id.* And, in granting Doe's motion, the Court considered important that while the accuser had characterized Doe as an unwelcomed, intimidating pursuer, the evidence cumulatively called the accuser's characterization into question, as well as her credibility. *Id.* at *10. Moreover, the Court found that while Notre Dame purported to permit only "witnesses to the incident" to testify at the hearing, its application of that phrase was arbitrary and, in practice, skewed against Doe. *Id.* at *6, 10. In addition, the Court noted that the hearing had been unfair because the hearing panel had cherry-picked which communications among Doe and the accuser to consider and refused to consider pertinent evidence to the accuser's credibility and state of mind. *Id.* at 11.

All these factors, and more, are present in this matter. Plaintiff seeks narrow relief. Jane's credibility, regarding both her relationship with Plaintiff and the incident in question, was substantially impaired, and yet the Hearing Panel found otherwise. IUPUI arbitrarily precluded Plaintiff from presenting supportive witnesses at the hearing but permitted Jane to do so. And, the Hearing Panel cherry-picked which communications among Plaintiff and Jane to consider. This resulted in

---

[2] The *Doe v. Notre Dame* opinion was subsequently vacated (*see* 2017 WL 7661416), but not on substantive grounds. Rather, the parties merely requested dismissal of the lawsuit, which required the restraining order be lifted. *Id.*

13

the Hearing Panel disregarding a host of communications that depict the true nature of Jane and Plaintiff's acquaintance, which largely consisted of Jane pursuing one-on-one time with Plaintiff.

### B. Plaintiff will suffer irreparable harm and lacks an adequate remedy at law if the Court denies his motion for TRO.

If Plaintiff is not permitted to complete the remaining weeks of his college education, he will likely lose his immigration status and be deported. And, given the timing, he is unable to immediately transfer to another university in order to complete this semester's course work. In addition, the suspension precludes Plaintiff from pursuing the graduate program he had already been accepted into, which, again, jeopardizes his immigration status. Graduate program aside, even if Plaintiff sought to complete his undergraduate degree elsewhere, another university is unlikely to accept an application for enrollment for the fall 2021 semester from him, given the suspension for sexual misconduct on his academic record. Clearly, the harm inflicted by Defendants' immediate suspension is irreparable and it is beyond the ability of money to fix.

And, again, case law supports Plaintiff's position. In *Doe v. Notre Dame*, the Court found that precluding Doe from taking the two exams he needed to graduate would constitute irreparable harm. *See* 2017 WL 1836939, at *12. In so holding, the Court stated:

> What's more, because of the timing of the University's discipline here, avoiding a gap in John's educational career is even more difficult. The pendency of the litigation inevitably creates a gap in John's education, as he was dismissed from the University just short of completing the semester and without an undergraduate degree. As noted, John has

14

> indicated, without contradiction by the University, that only two remaining courses (which were interrupted by his dismissal) are necessary for his degree requirements. [DE 9 at 5.] Even if John prevails in this case and the disciplinary dismissal is set aside by the final relief awarded, in order to earn his degree John would still be required to interrupt his career, return to South Bend and retake the two courses necessary for his degree. This would extend the unavoidable gap in John's academic career represented by the pendency of this lawsuit.
>
> I am persuaded that this gap constitutes irreparable harm to John's reputation and resumé for purposes of career prospects and possible further academic advancement. The questions the gap raises, and the explanation it requires, are potentially damaging to John in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in John's favor. To repeat, the preliminary relief John seeks is very narrow—an injunction that he be allowed to take two exams—and is appropriate to minimize the consequences of the irreparable harm attributable to the pendency of the lawsuit, if John meets the other requirements for preliminary injunctive relief.

*Id. See also Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *1 (D. Vt. 2015); *Ritter v. State of Oklahoma,*, No. CIV-16-0438-HE, 2016 WL 2659620, at *1 (W.D. Okla. 2016) (Courts in both cases, faced with requests for preliminary relief, finding plaintiffs subjected to irreparable harm due to suspensions from coursework).

Plaintiff's circumstance is strikingly similar to that of the plaintiff in the *Notre Dame* matter. He, too, seeks narrow relief, has minimal coursework to complete and, if precluded from doing so, would be burdened with explaining a practically inexplicable gap in his education.

This Court's authority to grant an immediate TRO until such time as the parties can be heard at a formal hearing is quite literally the only way for Plaintiff to avoid irreparable harm that will come from his immediate suspension. As indicated

15

above, Plaintiff has already missed a second mid-term exam that he will need to make up, and he has a final presentation to give on April 28, with a host of final exams and assignments due the first week of May. Plaintiff is prepared to proceed with a hearing on the merits of his request for temporary relief as soon as this Court's calendar will allow, and he is taking all available steps to provide Defendants with notice of his Complaint and motion for TRO.[3] Moreover, counsel for Plaintiff is prepared to answer any questions the Court may have prior to ruling on the pending motion for TRO.

WHEREFORE, for the reasons stated herein, Plaintiff, John Doe, by counsel, Jonathan A. Bont and Ian P. Goodman, respectfully requests that the Court grant Plaintiff's motion for TRO and immediately enjoin Defendants from enforcing IUPUI's suspension on Plaintiff and from seeking to revoke Plaintiff's immigration status until such time as the parties can be heard in this Court.

Respectfully submitted,

*/s/ Ian P. Goodman*
Jonathan A. Bont, Attorney No. 28476-49
Ian P. Goodman, Attorney No. 30645-59
Paganelli Law Group
10401 N. Meridian St., Suite 450
Indianapolis, IN 46290
Phone:     317.550.1855
Fax:       317.569.6016
E-Mail:    jon@paganelligroup.com
           ian@paganelligroup.com

*Counsel for Plaintiff, John Doe*

---

[3] Plaintiff will make a subsequent filing with the Court regarding his efforts to provide notice to Defendants of the Complaint and motion for TRO.

16

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Additionally, I am having this Brief and the contemporaneously filed Motion served on Indiana University Purdue University – Indianapolis by hand delivery to:

IUPUI Office of Chancellor
University Hall, Suite 5010
301 University Blvd.
Indianapolis, IN 46202

Further, I am having this Brief and the contemporaneously filed Motion served on The Trustees of Indiana University by FedEx overnight mail to:

Michael Mirro MD
Franklin Hall 200
601 E. Kirkwood Ave.
Bloomington, IN 47405

                                                */s/ Ian P. Goodman*
                                                Ian P. Goodman