UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:21-cv-00973-JRS-MPB |
| ) | |
| TRUSTEES OF INDIANA UNIVERSITY, ) | |
| INDIANA UNIVERSITY PURDUE ) | |
| UNIVERSITY-INDIANAPOLIS, ) | |
| ) | |
| Defendants. ) | |

**Entry on Plaintiff's Motion for Preliminary Injunction**

Indiana University suspended Plaintiff John Doe[1] from Indiana University, Purdue University-Indianapolis ("IUPUI") for violating the Indiana University Code of Student Rights, Responsibilities, and Conduct, by engaging in non-consensual sexual penetration of another student, Jane Roe. Doe contends that IUPUI's decision-making process was biased against him because of his male sex. He also contends that IUPUI's policy in evaluating "consent" in the context of a sexual encounter builds in sex bias. Doe sued the Trustees of Indiana University and IUPUI for sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88. He moved for a temporary restraining order prohibiting Defendants from enforcing their suspension of him and seeking to revoke his student visa immigration status, and the motion was converted to a motion for

---

[1] Plaintiff has been permitted to proceed under a pseudonym to protect his identity. Likewise, the student who accused him of sexual misconduct is referred to by the pseudonym, Jane Roe.

preliminary injunction.  For the reasons that follow, Doe's Motion for Preliminary Injunction is **denied**.

## Background[2]

On Monday April 19, 2021, John Doe, an international student in the United States on a student visa and a senior in college, was suspended from IUPUI effective immediately and until May 31, 2023.  The suspension followed IUPUI's investigation of Jane Roe's accusation of rape and other sexual misconduct alleged against Doe.

Doe and Roe met in 2019 in a class at IUPUI.  In October 2019, they spent time together on three occasions.  On the first, Roe initiated kissing Doe.  On the second, Doe accepted Roe's invitation to watch her in a dance practice.  On the third, Roe and Doe engaged in a consensual sexual encounter, but they did not have sexual intercourse.  (Motion for Prelim. Inj., Ex. A, John Doe Decl. ¶ 6, ECF No. 13-1.)  Doe and Roe did not communicate again until March 2020, when Roe commented on an Instagram post by Doe.  They exchanged a few Instagram messages shortly thereafter and again in June, July, and August 2020.  (Doe Decl. ¶ 7.)

On September 11, 2020, Roe texted Doe and invited him to her apartment.  Doe agreed and arrived at approximately 6 p.m.  The two of them engaged in a consensual sexual encounter.  As the encounter progressed, Roe asked Doe if he had a condom; Doe said he did, but it was too old to use.  Roe remembered that she had a condom, which she retrieved and gave to Doe.  Roe told Doe that she had not had

---

[2] Many of the facts are taken from Doe's Brief in Support of his Motion for Preliminary Injunction.  (*See* ECF No. 12 at 2– 10.)

sex before but wanted to at that time.  Doe and Roe began having sexual intercourse.  Three times, Roe expressed that she was experiencing discomfort and asked Doe to stop penetrating her; each time Doe complied.  But after the first and second times, Doe and Roe reengaged in sexual intercourse.  (*See* Doe Decl. ¶ 8; *see also* Sexual Misconduct Hrg. Tr. at 115 (stating that Roe said "stop,"; Doe asked what was wrong; Roe said it was painful; Doe explained if it was the first time, it would be painful and told her to take control), ECF No. 26-1 at 122.)  After the third time Roe said, "stop," Doe ended the encounter.  Roe cried afterwards.[3]  Doe and Roe have not communicated since.  (*Id.* ¶ 9.)

On September 12, 2020, Roe reported to the Indiana University Police Department ("IUPD") that the day before, Doe burglarized her apartment, confined her, and sexually assaulted her.  (Motion for Prelim. Inj., Ex. B, IUPUI Report of Allegations, ECF No. 13-2.)  On September 14, 2020, IUPD notified IUPUI of Roe's allegations.  (*Id.* at Ex. C, IUPUI Final Investigation Report at 1, ECF No. 13-3.)  IUPUI investigated Roe's allegations, focusing on whether Doe had violated the Indiana University Discrimination, Harassment, and Sexual Misconduct Policy UA-03 (the "Sexual Misconduct Policy" or "Policy") and the Code of Student Rights, Responsibilities and Conduct (the "Code of Conduct").  (Motion for Prelim. Inj., Ex. C at 1; *see id.* at Ex. D, Policy; *id.* at Ex. E, Code of Conduct; ECF Nos. 13-3, 12-4, 12-5.)

---

[3] Roe alleges she cried during sexual intercourse as well.

IUPUI's Sexual Misconduct Policy for the 2020-21 academic year covers sexual misconduct behaviors, including sexual assault. (ECF No. 12-4 at 1, 165.) For purposes of the Title IX provisions of the Policy, "Sexual Assault" includes "Any sexual act directed against another person, without the consent of the Complainant" such as "Forcible Rape – Penetration, no matter how slight, of the vagina . . . with any body part . . . without the consent of the Complainant." (Policy, ECF No. 12-4 at 37.) The "Complainant" is "An individual who may have experienced . . . sexual misconduct." (ECF No. 12-4 at 34.) The Policy defines "Consent" as follows:

> An agreement expressed through affirmative, voluntary words or actions, and mutually understandable to all parties involved, to engage in a specific sexual act at a specific time
>
> 1. Consent can be withdrawn at any time, as long as it is clearly communicated.
> 2. Consent cannot be coerced or compelled by force, threat, deception or intimidation.
> 3. Consent cannot be given by someone who is incapacitated, as defined below.
> 4. Consent cannot be assumed based on silence, the absence of "no" or "stop," the existence of a prior or current relationship, or prior sexual activity.

(ECF No. 12-4 at 35.)

On February 18, 2021, IUPUI tendered to Doe a Final Investigation Report (the "Final Report"), which detailed its investigation of whether Doe had violated the Sexual Misconduct Policy and the Code of Conduct. The Final Report indicated there were few undisputed material facts, while most operative, materials facts were disputed, including whether Doe had consent from Roe to penetrate her vagina with his penis. The Final Report stated that the charges against Doe, under both

the Sexual Misconduct Policy and Code of Conduct, regarding sexual harassment and abuse, were warranted. (Motion for Prelim. Inj., Ex. C, Final Report at 19–22, ECF No. 13-3.)

During IUPUI's investigation, Doe asked Kailey Rigdon, who had been assigned to investigate the matter on behalf of IUPUI, what witnesses at the hearing would be presented against him and what witnesses he could bring. According to Doe, Rigdon responded that only witnesses who had first-hand accounts of the incident could be called at the hearing. (Doe Decl. ¶ 10, ECF No. 13-1.) Doe called no witnesses at the hearing. But, Roe did present witnesses at the hearing who had not been present at the incident. However, the record discloses that before the hearing, Rigdon had met with Doe to explain the Sexual Misconduct Policy and process and emailed him a packet of information about the process and procedure, including a description of relevant witnesses. (Rigdon Affirmation, ¶¶ 16, 17, ECF No. 26-2 at 4.)

On March 5, 2021, IUPUI's Hearing Panel conducted a hearing regarding the charges against Doe for alleged violations of the Code of Conduct and Sexual Misconduct Policy.[4] Roe and Doe made introductory remarks; the three hearing panelists questioned each of them; and Roe and Doe, through their hearing advisors, asked questions of each other. Four witnesses testified and were questioned by the panelists and the advisors. Doe and Roe each had the opportunity to make closing arguments. After the hearing, the panelists

---

[4] The Court has reviewed the video recording of the hearing.

5

deliberated for approximately five hours over three days before reaching a decision. (Magallon Affirmation ¶ 29, ECF No. 26-4.)

The Hearing Panel consisting of three members decided that Doe had violated the Code and the Policy by committing Harassment, including Sexual Harassment and Non-Consensual Sexual Penetration. Its rationale is contained in the deliberation worksheet and March 25, 2021 Letter to Doe (the "Outcome Letter"). (Magallon Affirmation ¶¶ 30–31, 38–39 & Ex. B at 2–3, ECF No. 26-4.) Their primary rationale included:

> Timeline [of Roe] immediately contacting witnesses and seeking medical attention, contact of witnesses when it happened[;] the information reported [by Roe] within the medical exam and the details given to the investigator remained consistent[;] and [Roe made] contact to police immediately the next day . . . Text messages and witness accounts[;] [Roe's] distress acknowledged by both parties[;] Neither party denied [Roe] stated stop . . . Neither party denied [Roe] was crying[;] witness accounts supported the statements [Roe] shared with them and all witnesses described [Roe] as being in distress when they first spoke to her[;] [and] When asked, [Doe] admitted he did have his hands interlocked with [Roe's] hands above her head, before [she] said stop.

(Magallon Affirmation, 2–3, ECF No. 26-4 at 24–25.) The Outcome Letter further explained that Doe "stated that he believed [Roe] was asking him to stop due to the penetration being painful as a result of this being [her] first time, but not due to lack of consent. However in both the hearing and investigation report, [Doe] stated he did not believe this was [Roe's] first time having sex." (Outcome Letter at 2, ECF No. 26-4, 30.) And, "both parties stated in the investigation report, and [Doe] agreed during the hearing, that [Roe] was crying immediately following penetration." (*Id.*) Further, one witness stated that when she received a video call

6

from Roe, Roe was "crying hysterically" and Roe said, "I think I was just raped." (*Id.* at 3.) Moreover, based on the undisputed facts, including that Doe's "hands were held above her head, she was crying after penetration and [her] distress immediately after the encounter," the Hearing Panel concluded "that it is more likely than not that [Roe] did not consent to vaginal penetration." (*Id.*) As a result, IUPUI suspended Doe effective immediately and until May 31, 2023. (*See* ECF No. 26-4.)

Doe appealed the Hearing Panel's decision to the Dean of Students, taking issue with the Hearing Panel's weighing of the evidence, alleging irregularities in the Hearing Panel's decision-making process, and arguing that the Hearing Panel ignored important facts, that the Hearing Panel Chair Jose Magallon had a conflict of interest, and that the sanction imposed was disproportionate to the alleged violations. Doe's appeal was denied, and Doe's two-year suspension became final. (Sara Dickey Affirmation ¶ 35, ECF No. 26-3.)

## Discussion

"A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of success on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if an injunction is denied. *Cassell*, 990 F.3d at 544–45. If the movant fails to make this threshold showing, the court must

deny the injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If this threshold showing is made, the court proceeds to "a balancing phase," where it balances the potential harms to the parties and the public interest. *Cassell*, 990 F.3d at 545 (quoting *Girl Scouts*, 549 F.3d at 1086). The Seventh Circuit has referred to this as a "sliding scale" approach: "The more likely the [movant] is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Cassell*, 990 F.3d at 545 (quoting *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018)).

Title IX prohibits educational institutions that receive federal funds from discriminating against students on the basis of sex. 20 U.S.C. § 1681(a). To support a Title IX claim, a plaintiff must show that an educational institution discriminated against him because of his sex. *Id.*; *see also Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019). A plaintiff alleging sex discrimination in the context of university disciplinary proceedings must show that "sex was a motivating factor in a university's decision to discipline a student." *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019) (eschewing the use of doctrinal tests to identify bias in the context of university discipline). In other words, the plaintiff must allege facts that "if true, raise a plausible inference that the university discriminated against [him] 'on the basis of sex'". *Purdue Univ.*, 928 F.3d at 668.

Doe argues that his sex was a motivating factor in the decision to suspend him based on the fact that IUPUI credited Roe's allegations that she was raped by Doe

8

and discredited his account, despite the evidence he maintains suggests she was not credible, including: (1) Roe told a friend the night of the sexual encounter that alcohol played a role, which Roe later denied; (2) Roe reported to campus police that Doe had burglarized her but stated at the hearing she had invited him to her apartment; (3) the Hearing Panel did not credit Roe's testimony that she had not consented to Doe's kissing her breasts and touching her genitals; (4) though Roe claimed Doe had strangled her neck, the medical examination of Roe at the hospital the night of the incident revealed no trauma to her neck;[5] (5) Roe failed to disclose that approximately one year before, she and Doe had a prior consensual sexual encounter involving physical intimacy but not sexual intercourse; and (6) Doe's version of the incident was consistent and accounted for the awkwardness and discomfort of their attempt at intercourse.  Doe describes the disciplinary case presented to the Hearing Panel as a case of "he-said-she-said."  (Br. in Support Prelim. Inj. 9, ECF No. 12.)  Thus, Doe essentially concedes that in order to resolve the charges against him, the Hearing Panel *had* to find that *either* Doe *or* Roe was credible and that the other was not.  The mere fact that the Hearing Panel ultimately found Roe more credible than Doe does not reasonably suggest a bias against him because of his sex.  Doe simply takes issue with the Hearing Panel's weighing of the evidence before it.  Based on the record before the Court, a different view as to how the evidence should have been weighed by the Hearing Panel does not reasonably suggest a bias against Doe based on his sex.

---

[5] The medical examiner did note that Roe reported "pain upon palpation" of her neck during the exam.  (*See* Jose Magallon Affirmation ¶ 36, ECF No. 26-4.)

Doe makes much of the lack of evidence regarding the results of the forensic sexual assault examination of Roe and IUPUI's alleged indifference to those results. (*See e.g.*, Reply 19, ECF No. 35.) He also argues that the hospital records did not corroborate Roe's allegations of rape. Although evidence of the use of physical force or injury could support a rape charge under Indiana law, *see* Ind. Code 35-42-4-1, the Hearing Panel did not find Doe guilty of rape under Indiana law, but rather for violating the Code of Conduct, specifically for Harassment, including Sexual Harassment, and Non-Consensual Penetration. (March 24, 2021 Hearing Panel Letter to John Doe, 1, ECF No. 26-4.) Under the Policy, "Forcible Rape" is defined as "Penetration . . of the vagina . . with any body part . . . without the consent of the Complainant." (Policy, ECF No. 12-4 at 37.) Doe does not contest the evidence that his penis penetrated Roe's vagina. The issue is whether Roe consented to that penetration. None of the charges against Doe require proof of physical force or injury. Nor do they require a finding of ejaculation. That Roe thought Doe ejaculated—even if he did not——does not necessarily affect her credibility.

In addition, Doe contends that IUPUI's evaluation of "consent" in the context of a sexual encounter builds in sex bias. He submits that under the Sexual Misconduct Policy, the Hearing Panel necessarily would have shifted the burden to Doe to prove consent and then arbitrarily discarded the evidence he presented to show that Roe had consented to the sexual encounter. Doe is complaining that IUPUI's Policy puts the burden on the person alleged to have engaged in sexual misconduct under the Policy. (*See* Policy, ECF No. 12-4 at 37.) Even if so, Doe's

10

complaint amounts to a challenge to a bias in favor of alleged sexual-assault victims. Such a bias does not suggest a bias based on *sex*. *See, e.g.*, *Doe v. Loyola Univ.-Chi.*, No. 20 CV 7293, 2021 WL 2550063, at *7 (N.D. Ill. June 22, 2021) ("[A] pro-victim bias is not sex bias—both women and men can commit or be victims of sexual assault.") (citing *Johnson v. Marian Univ.*, 829 Fed. App'x 731, 733 (7th Cir. 2020)); *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017) ("[E]ven viewing these allegations [that the student manual refers to complainants as "victims," suggesting a presumption of guilt, and that the accused are questioned more aggressively than complainants] in the light most favorable to Plaintiff, they all are indicative, at best, of a bias in favor of sexual assault complainants and against those accused of sexual assault, regardless of gender."), *aff'd*, 933 F.3d 849 (7th Cir. 2019).

Further, Doe maintains that the Hearing Panel conducted the hearing in an arbitrary and unfair manner. He alleges that IUPUI by Kailey Rigdon, who was investigating the matter on behalf of IUPUI, informed him that only witnesses who had first-hand accounts of the incident could testify at the hearing, which was not the case for Roe as she was allowed to present witnesses who had not been present. Doe identifies one witness that he would have liked to present: an IUPUI professor who would have testified about Doe's and Roe's interactions in the classroom in 2019, which, according to Doe, was "long before the incident." (John Doe Decl. ¶ 10, ECF No. 13-1; Rigdon Affirmation, ¶ 18 and p. 212, ECF No. 26-2; Br. in Support Prelim. Inj. 12, ECF No. 12.) The Court fails to see how the professor's testimony

11

could have any relevance to the alleged sexual misconduct. Just like Doe's and Roe's consensual sexual encounter almost a year before the incident in question, which was of a very different nature than the sexual intercourse at issue, any interactions between Doe and Roe "long before" the incident would have little to no bearing on what did or did not happen the night in question. Witnesses who could testify as to Doe's words and actions shortly after the incident, however, could offer relevant evidence.

According to Doe, the Chair of the Hearing Panel, Jose Magallon, IUPUI's Assistant Director of the Office of Student Conduct, had a conflict of interest that should have precluded his participation on the panel. Based on Magallon's published job description as a primary investigator and hearing officer of allegations of personal misconduct, Doe argues that Magallon was like a detective and judge in the disciplinary proceeding. Doe suggests that Magallon could have reviewed documents and discussed the matter with investigator Rigdon before the hearing. (Doe's Title IX Hearing outcome appeal, 9–10, ECF No. 13-5.) However, the uncontradicted evidence is that Rigdon and Magallon do not discuss their investigations with each other and did not discuss the investigation into Roe's charges against Doe with each other. (Rigdon Affirmation ¶ 2, ECF No. 26-3 at 3; Magallon Affirmation, ¶ 18, ECF No. 26-4 at 4.)

Another "irregularity" in the Hearing Panel's decision-making, Doe maintains, is the Panel's conclusion that he admitted Roe asked him to stop penetrating her, which Doe says mischaracterizes his testimony. He argues that he testified Roe

12

asked him to stop several times because it hurt her, and then she verbally or physically expressed her desire to continue engaging in sex. The Panel noted the contradiction between Doe's testimony and Roe's testimony regarding whether she ever consented to vaginal penetration, (ECF No. 26-4 at 31), but the Panel explained that although Doe said "he believed [Roe] was asking him to stop due to the penetration being painful as a result of this being [her] first time, . . . not due to lack of consent," he also stated during the investigation and at the hearing that he did not believe it was Roe's first time having sex. (Outcome Letter at 2, ECF No. 26-4 at 30.) Those are contradictory statements by Doe. The statement that he thought Roe was saying "stop" because it was her first time, was offered to justify why he persisted in trying to penetrate her. Under the Sexual Misconduct Policy, consent can be withdrawn at any time. (*See* ECF No. 12-4 at 35.) And based on the undisputed facts, including that Doe's "hands were held above her head, she was crying after penetration[,] and [her] distress immediately after the encounter," the Hearing Panel found it "more likely than not that [Roe] did not consent to vaginal penetration." (*Id.*) Doe does not dispute that he persisted in penetrating Roe after she had told him, "stop." While under the Policy, "Consent cannot be assumed based on . . . the absence of 'no' or 'stop,'" (ECF No. 12-4 at 35), no persuasive argument can be made that the complainant's assertion of "stop" during sexual penetration is not a withdrawal of consent.

Doe also argues that the sanction imposed against him was too severe and the Hearing Panel failed to consider the absence of aggravating factors and the

13

presence of mitigation factors. However, the record supports a finding that the Panel did consider Doe's lack of understanding of the events with Roe the night of September 11, 2020, and the absence of premeditation or other forms of physical violence as mitigating factors. (Magallon Affirmation, Ex. B at 4; ECF No. 26-4.) While a two-year suspension is serious for any student on the brink of graduation, and even more so given Doe's immigration status, the Hearing Panel could have imposed the sanction of expulsion for the conduct for which it found Doe responsible. Indeed, that is the typical sanction for the conduct for which the Hearing Panel found Doe responsible. (Magallon Affirmation ¶ 40, ECF No. 26-4.) That the Hearing Panel imposed a lesser sanction neither shows a failure to consider aggravating and mitigation factors, nor, more importantly, evinces sex bias.

*Doe v. University of Notre Dame*, 3:17-CV-298, 2017 WL 183693 (N.D. Ind. 2017), is cited by Doe as support. That case is inapposite because the court only considered the plaintiff's breach of contract claim and did not consider the merits of the Title IX claim. *Id.* at \*11. The court never hinted that the disciplinary process, with all its potential flaws, raised a reasonable inference that sex was a motivating factor in the university's disciplinary decision.

Doe argues that Defendants' disregard for basic notions of fairness and due process in the disciplinary proceeding reasonably suggests that they were biased against him and in favor of Roe based on Doe's sex. He cites *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020), for the proposition that

14

where a legally protected characteristic is the only difference between two persons, disparate treatment of them is circumstantial evidence of unlawful discrimination. The *Joll* court observed that "better treatment of people similarly situated but for the protected characteristic" is circumstantial evidence that will support an inference of intentional discrimination. *Id.* But, unlike the female applicant for a coaching position and male applicant who was selected for the position in *Joll,* Doe and Roe are not similarly situated but for their sex. Doe was accused of sexual misconduct, including engaging in nonconsensual sex; Roe was the accuser. Besides, the Hearing Panel explained its decision to find Doe responsible for violating the Code of Conduct, including by engaging in non-consensual sexual penetration. Nothing in the Hearing Panel's decision, its rationale, or IUPUI's investigation raises a reasonable inference that Doe's sex played a motivating factor to find him responsible for Code of Conduct violations or suspend him as a result.

Because Doe cannot raise a reasonable inference that his suspension was because of his sex, he has not shown some likelihood of success on the merits of his Title IX claim. Therefore, the Court's analysis ends, and the Court finds that the motion for preliminary injunction must be denied.

## Conclusion

Accordingly, Plaintiff's Motion for Preliminary Injunction, (ECF No. 11), is **denied**.

**SO ORDERED.**

15

Date: 7/15/2021

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to all registered counsel of record